## FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**THOMAS W. VANES**
Merrillville, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**ANGELA N. SANCHEZ**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DUSTIN E. McCOWAN, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 64A03-1305-CR-189 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE PORTER SUPERIOR COURT
The Honorable William E. Alexa, Judge
Cause No. 64D02-1109-MR-9107

**April 23, 2014**

**OPINION–FOR PUBLICATION**

**BAKER, Judge**

After a three-week jury trial, appellant-defendant Dustin E. McCowan was found guilty of Murder,[1] a felony. On appeal, we find that McCowan has waived the challenges that he made in his motion to suppress regarding the admissibility of his cell phone records including the text messages, and the location of the calls that were made because he failed to properly object at trial.

Waiver notwithstanding, we find that under the totality of the circumstances, McCowan's rights to be free from unreasonable search and seizure under Article I, Section 11 of the Indiana Constitution were not violated when the police obtained McCowan's cell phone records. Thus, the records were properly admitted, and any dispute about the accuracy of the location estimates and context of the text messages were for the jury to resolve. We also conclude that the trial court did not err in refusing to give McCowan's tendered instruction on the presumption of innocence and that the trial court properly declined to recuse itself because there was no evidence of improper ex parte communication. Thus, we affirm the judgment of the trial court.

<u>FACTS</u>

McCowan and the victim, Amanda Bach, who lived in Portage, dated off and on before Bach was murdered in September 2011. Several individuals observed that the two fought constantly when they were together and that McCowan was verbally mean and abusive to Bach. Even Bach's parents urged her to "move on" because they described McCowan as "psycho or bipolar." Tr. p. 289.

---

[1] Ind. Code § 35-42-1-1.

Sometime near the end of August 2011, McCowan and Bach ended their relationship after Bach overheard McCowan tell others at a party that he was just "using Amanda" and that he was sleeping with someone else. Id. at 790, 845. After this incident, McCowan and Bach did not speak to each other.

Over the 2011 Labor Day weekend, McCowan's best friend, Brandon Hutchins, returned from college. Hutchins and Bach were also close friends and began dating. McCowan believed that Bach was coming between him and Hutchins. At a bonfire during Labor Day weekend, McCowan sent Bach a text message telling her to never text him again because "you stole my best friend." Id. at 794. McCowan told Hutchins's sister that he hated Bach because she was ruining his life.

Around this same time, McCowan feared that Bach might be pregnant. He was "freaking out about it for the longest time." Id. at 1192. McCowan repeatedly said that he could not be a father because it would destroy his life. McCowan also told Hutchins that he "would punch her in the stomach if she was [pregnant] because it would ruin his life." Id. at 798. Although Bach took a pregnancy test that yielded a negative result, McCowan did not trust the test, continued to talk about it, and still believed that Bach might be pregnant. McCowan's doubts continued for several weeks and lasted until Bach was killed, and one of McCowan's friends was not sure that McCowan ever believed that Bach was not pregnant before she died.

McCowan and Bach exchanged text messages making amends and made plans for Bach to come to McCowan's residence on the night of September 15, 2011. Bach waited

for McCowan's parents, who both worked nights, to leave for work and arrived at McCowan's house around 11:00 p.m. Bach told McCowan that she did not want to see him anymore because she had spoken with her father, and he did not want her to be around him.

During that conversation, Bach was using her cell phone, which made McCowan angry, and he grabbed the phone from her. In the process, McCowan hit her in the nose, causing it to bleed. McCowan gave Bach an orange shirt that he had worn earlier in the day to stop the bleeding. In the early morning hours the next day, one of McCowan's neighbors heard three gunshots. At approximately 1:00 a.m., McCowan's next-door neighbor, Linda Phillips, heard voices outside her bedroom window, which faces McCowan's house. Phillips heard a man say, "Amanda, get up. Amanda get up," about fifteen times. Tr. p. 397. Phillips then "heard a female voice saying, 'I can't believe this is happening.'" Id. at 396. Although Phillips went to her bedroom window and looked out, she could not recognize the male whom she saw because she was not wearing her glasses. However, she noticed that every light in McCowan's residence was on, and she had never seen the house lit up like that. Id. at 398, 404.

At approximately 2:25 a.m., Michael Steege was driving to work. While Steege was driving northbound, he noticed McCowan walking southbound towards him on the road. A short distance up the road, Steege passed Dean's General Store (the Store) in Wheeler and saw Bach's vehicle in the parking lot. The evidence subsequently showed that McCowan took Bach's vehicle to the Store and abandoned it around 2:30 a.m. Her

4

vehicle was not in the parking lot at 1:50 a.m. when newspapers were delivered to the store, but it was there when Steege passed the store around 2:30 a.m.

When the store's owner, Dean Marquart, arrived and saw Bach's vehicle, he contacted the police. The driver's side door of Bach's vehicle was open, the interior dome light was on, and the hazard lights were flashing. The keys were in the ignition, Bach's purse was on the front seat, and its contents appeared undisturbed. However, Bach's cell phone was not in the vehicle. The front driver's side tire of Bach's vehicle was flat and would have been impossible to drive. The evidence showed that the tire had been slashed with a single-edged blade while the vehicle was moving forward.

At approximately 3:00 a.m. on September 16, 2011, the police telephoned Bach's father, explaining that her vehicle had been found at the Store. When Bach's father arrived at the scene, he immediately noticed that the driver's seat was set too far back for Bach to have driven the vehicle. Bach was 5'2" tall and always drove with the seat pulled close to the steering wheel. The seat was also too far back for the 5'10" officer at the scene to drive it. On the other hand, McCowan is 6'3" tall, and when he drove Bach's vehicle, which he did regularly, he always pushed the seat nearly all the way back.

Bach's father learned that his daughter had been with McCowan the night before and obtained McCowan's telephone number. Officer Joseph Mendez telephoned McCowan. At that time, McCowan stated that Bach had left his house alone around 1:30 a.m. Although McCowan told Officer Mendez that he had been trying to contact Bach

5

and could not reach her, the telephone records show that he only made two calls to her phone that were one minute apart at 4:36 a.m., after Bach went missing. Officer Mendez spoke with McCowan two more times over the next hour and one-half. On each occasion, McCowan repeatedly stated, "I'm scared, I'm scared." Tr. p. 435. However, Officer Mendez thought that McCowan's tones and emotions seemed "exaggerated." Id. at 435-36.

McCowan told the police and some friends that Bach was at his house from 11:00 p.m. until approximately 1:30 a.m. The others thought that McCowan's statement was strange because Bach had a 1:00 a.m. curfew, and they knew that she and McCowan nearly always fought.

Once word was out that Bach was missing, a search party was organized near the store for Saturday morning. McCowan did not join the group. Rather, at approximately 1:30 p.m., McCowan left Wheeler to attend a party with some friends at Indiana University in Bloomington. McCowan's friends were surprised that he went because Bach was still missing. Although McCowan stated that Bach's disappearance would ruin his time at I.U., he stated that he would "party in her honor." Tr. p. 1229, 1255.

Nicholas Prochno lived a few blocks from the Store and was engaged to the mother of one of McCowan's friends and classmates. Prochno knew that Bach was last seen with McCowan. He also was aware that his fiancée had seen some children hiding on the railroad tracks near McCowan's house in the early morning hours in the past.

6

Prochno noticed the police near his house on Saturday afternoon and told them that he knew Bach was last seen with McCowan. He suggested that they might look near some railroad tracks that ran close to his house. Prochno and some of his other friends were aware that McCowan would hide trash in that area after parties when his parents were not home.

Prochno led the officers to that area and at approximately 4:00 p.m. on September 17, Bach was observed lying on the ground. It was later determined that Bach was shot in the neck from close range, and the bullet lodged beneath the skin at the back of her throat. Bach's body was found approximately 300 yards from McCowan's home where, indeed, he had previously hidden trash. The tracks ran north of McCowan's house and approximately two miles from the Store.

The evidence showed that Bach had been dragged a considerable distance and the position of her body appeared to be "staged" in a manner to suggest that she had been the victim of a sexual assault. Tr. p. 1045, 1753. However, there were no signs of sexual assault and no clear indications that she had been beaten or struck.

The police also found an orange shirt on the railroad tracks. Subsequent DNA testing revealed that it contained Bach's DNA. McCowan was arrested, and it was determined that McCowan wore an orange shirt on Thursday. Following the arrest, McCowan was incarcerated in the Porter County Jail, where he and his cellmate, Charles Wade III, became friends. Wade exchanged telephone calls and letters with various members of McCowan's family. At some point, McCowan admitted to Wade that he hit

7

Bach in the nose and caused it to bleed. Thereafter, he gave Bach his shirt to stop the bleeding. McCowan explained that he and Bach continued fighting and McCowan took Bach's telephone and hid it in an abandoned house.

About one year after his arrest, McCowan told another inmate that he was in jail because he had "shot a girl" named Amanda because she had "crossed him." Tr. p. 2120-22. McCowan bragged that no one could prove that he "shot the bitch" and [the police] would never find the gun because it was "buried so far" that nobody would find it. Id. at 2125.

The investigation revealed that Bach was shot with a Federal brand Hydra-Shok .38 hollow point bullet. McCowan's father owned this type of gun with the type of ammunition that was used. McCowan knew about this gun and ammunition and would occasionally bring these out at parties and "show them off." Id. at 1141. McCowan's father last saw the gun on September 17, but had seen it on the previous Monday.

On Friday evening, when Bach was still missing, the police filed an exigent circumstances request to obtain telephone records for both McCowan and Bach. The request to Verizon for McCowan's records asked for information about his activity from midnight on Friday to the current time. These records included data about the time, date, and phone numbers for all calls and text messages made and received during that period, information about the cell towers through which the activity was transmitted, and latitude and longitude coordinates for Verizon's estimated location of the phone at the time of the transaction. The records included the content of the text messages.

8

On September 29, 2011, the police obtained a warrant and requested McCowan's cell phone records including text content and phone location information. However, the records that Verizon provided in response to the warrant did not contain the latitude and longitude phone locations.

Detective Gene Hopkins took McCowan's phone records and plotted the latitude and longitude locations provided by Verizon for 576 points of phone activity with a computer mapping program. The activity occurred between midnight and 6:30 p.m. and revealed a general pattern of activity near Wheeler followed by movement down Interstate 65 and into Bloomington.

Witnesses and other evidence established McCowan's location many times, and the mapped phone activity generally clustered around those known locations. The activity between midnight and 2:12 a.m. generally clustered in the vicinity of McCowan's home. After that, the location of the phone transmission moved north and switched to access a cell tower in Wheeler, and activity between 3:00 and 3:30 a.m. was clustered in an area only a few miles from McCowan's residence and near where Bach's vehicle was found before moving south again to the vicinity of McCowan's home.

On the first day of the trial, McCowan filed a motion to suppress his phone records based on wiretap statutes and the Indiana Constitution. McCowan argued that exigent circumstances did not exist to "justify the invasion into . . . McCowan's privacy, . . that the Indiana Wire Tap Act required a showing of probable cause, and the "interception [of the electronic communication] was not approved" in a timely fashion. Appellant's App.

9

p. 215. In essence, McCowan asserted that "the cell site data intercepted from . . . McCowan's phone, and all evidence flowing therefrom, is inadmissible and should be suppressed." Id. at 227.

Additionally, McCowan alleged that "the cell records obtained on the day of Bach's disappearance were in fact used to build a case against McCowan, not locate the missing woman, and as such, without a warrant, the records were obtained via unreasonable police conduct." Appellant's Br. p. 10.

A hearing was held prior to the start of the trial, at which time McCowan also challenged the reliability of the location data within the records. The trial court noted the lateness with which McCowan had filed his motion to suppress, but entertained the motion and subsequently denied it. The trial court ruled that

> [The] State was after . . . historical data, nothing that was going on at the time it was going on; in other words, no conversations, nothing like that, as they were ongoing. They were getting that information in terms of an investigation for a missing woman. There was some evidence that there could have been foul play there, and it comes under the exigent circumstances. I think that would not require a warrant as to anything that they obtained during that first level. . . . It was past history that they were looking up and they wanted to track it, not ongoing conversations or any kind of electronic communications.

> You say that there was an expectation of privacy. Well, you know in the days of cell phones, when you're now talking about a wire connection directly from person to person, you hit the button on that send on the cell phone and you're sending that to basically the whole world, not just another person. It goes to the tower, the cell phone tower company; the company keeps that as part of their records. I don't know how there's going to be an expectation of privacy by any person that uses a cell phone because they know that's what's going to be happening. . . . Anybody who uses a cell phone, they do that voluntarily.

> Motion to suppress is going to be denied.

10

Tr. p. 242.

Immediately before Detective Hopkins testified at trial, McCowan moved to exclude his phone records and argued that the scientific principles that were used to produce the latitude and longitude coordinates were unreliable and that Detective Hopkins was unqualified to provide expert testimony about them. Detective Hopkins testified that the location data in the records was not GPS-based, that he did not know the algorithm by which the data was computed, that Detective Hopkins had no knowledge regarding scientific testing of the manner by which Verizon computed location coordinates, and that Verizon itself "could not and would not vouch for the accuracy of that data." Tr. p 1870-79.

However, after hearing the evidence, the trial court determined that Detective Hopkins had sufficient training and knowledge to explain how cell phones are located through the signals transmitted to towers and that concerns about the accuracy of the results went to the weight rather than the admissibility of the evidence and "should be explored through cross-examination." Tr. p. 1884. When the State moved to admit the cellular records, McCowan objected on the basis of "previously filed motions." Id. at 1894. The trial court overruled the objection and allowed the evidence.

Following the evidence that was presented during a three-week jury trial that commenced on February 4, 2013, McCowan tendered a jury instruction regarding the presumption of innocence that the trial court refused to give. McCowan contended that the trial court erroneously refused his instruction because it was obligated to instruct the

11

jury 1) that the presumption prevails throughout the trial, and 2) that it is the jury's duty to reconcile the evidence upon the theory of innocence if it can do so. McCowan argued that the trial court instructed on neither the continuing nature of the presumption nor the jurors' duty to reconcile the evidence to the presumption.

McCowan was found guilty as charged. On March 28, 2013, he was sentenced to sixty years of incarceration. Thereafter, on April 18, 2013, McCowan filed a post-sentencing motion to correct error. The motion included an affidavit from McCowan's trial counsel, alleging that a jail recording of a telephone conversation between McCowan and another individual "might contain a threat" was given to the trial judge by the sheriff without notice to defense counsel. Appellee's Br. p. 17. Thus, McCowan alleged that the transmission of the recording to the judge constituted an improper ex parte communication, and the trial court's subsequent failure to recuse from the case amounted to reversible error. The trial court denied the motion on May 3, 2013, and McCowan now appeals.

### DISCUSSION AND DECISION

### I. Admission of Telephone Records

### A. Waiver—Generally

McCowan claims that his conviction must be reversed because the trial court erred in admitting the cell phone records that were allegedly unreliable and obtained in violation of his right to be free from unreasonable search and seizure contrary to Article I, Section 11 of the Indiana Constitution. McCowan further contends that the trial court

abused its discretion by admitting "dubious data" that was contained in the phone records. Appellant's Br. p. 10.

In resolving this issue, we initially observe that because McCowan did not challenge the denial of his motion to suppress through an interlocutory appeal and waited until the completion of the trial to appeal, he is alleging that the trial court erred in admitting the evidence at trial. Washington v. State, 784 N.E.2d 584, 587 (Ind. Ct. App. 2003). The decision to admit or exclude evidence is within the trial court's sound discretion and is afforded great deference on appeal. Carpenter v. State, 786 N.E.2d 696, 702 (Ind. 2003). An abuse of discretion occurs when the trial court's decision is clearly erroneous and against the logic and effect of the facts and circumstances before it. An error in the admission of evidence is only grounds for reversal if it affects a party's substantial rights. Payne v. State, 854 N.E.2d 7, 17 (Ind. Ct. App. 2006).

As a general rule, a party must continue to object and obtain a ruling for each individual instance of inadmissible evidence. Hutcherson v. State, 966 N.E.2d 766, 770 (Ind. Ct. App. 2012), trans. denied. Also, a contemporaneous objection when the evidence is introduced at trial is required to preserve the issue for appeal, whether or not the appellant has filed a pretrial motion to suppress. Brown v. State, 929 N.E.2d 204, 207 (Ind. 2010). When a defendant does not object to the introduction of evidence, makes only a general objection, or objects only on other grounds, the defendant waives the claim. Moore v. State, 669 N.E.2d 733, 742 (Ind. 1996).

13

In this case, although McCowan objected at trial to the admission of the cell phone records, he made no objection to any other testimony about the content of his text messages and made no constitutional objection to the exhibits that transcribed the various portions of his messages that were offered at trial. Tr. p. 362, 446-47, 473, 677-81, 686-87, 702-17, 772. Rather, the focus of McCowan's objections concerned the admission of the location estimates. To the extent that McCowan is now asserting on appeal any challenge to the admission of the records including the content of the text messages, he has waived that claim. Additionally, McCowan did not specifically object to each instance in which the challenged evidence was presented to the jury.

As noted above, McCowan objected to the admission of the phone records themselves "based on previously filed motions," although he did not specify whether he was referring to his pretrial motion to suppress or his motion regarding the scientific reliability or both. Tr. p. 1894.

McCowan correctly points out that continuing objections are a "way to allow the trial judge to consider the issue in light of any fresh developments and also to correct any errors." Hutcherson, 966 N.E.2d at 770. However, McCowan did not request, and the trial court did not recognize, a continuing objection to any of the testimony or exhibits that were derived from the phone records. See id. (recognizing that a continuing objection may substitute for repeated objections but only when requested and recognized by the trial court). Thus, we cannot agree with McCowan's proposition that even though he did not explicitly seek and obtain the trial court's permission to maintain a continuing

14

objection, "he acted as if he had and the trial court had no apparent difficulty in treating objections as if continuing and had no apparent difficulty understanding the nature of the objection." Appellant's Reply Br. p. 4.

When the maps plotting the latitude and longitude locations that Verizon provided in those records were admitted, McCowan did not object on the basis of prior motions, scientific reliability of the method used to calculate the estimate, or the Indiana Constitution. Rather, McCowan only objected that the maps were not accurate because "they contained merely estimates and were unduly prejudicial." Tr. p. 1899, 1902, 1906, 1908, 1910-26. McCowan did not object to Detective Hopkins's testimony about the records but only to the maps and records themselves. Moreover, McCowan did not preserve his claims with timely and specific objections each time the evidence, including the maps, was presented to the jury, which was necessary for it to fully comprehend the coordinates.

For instance, the exhibit containing the challenged phone records is extremely thorough and difficult to comprehend because it contains tables of primarily coded or numerical data that comprises numerous pages as to each call or message. State's Ex. 148. In fact, the maps—not the phone records—were the method for conveying the estimated locations to the jury because the phone records themselves contained only latitude and longitude coordinates that would likely have been meaningless to the jury without the maps. Id. at 148.

15

We also note that McCowan did not challenge the admissibility of the maps on constitutional grounds, so he has waived that claim. Likewise, his objections to the maps based on accuracy and prejudice were inadequate to preserve his challenge. More particularly, a claim that a technical process produced inaccurate results in a particular case is not the same as a challenge to either a witness's qualifications or the scientific reliability of the technical process itself. See Hopkins v. State, 579 N.E.2d 1297, 1301-03 (Ind. 1991) (holding that whether scientific process produced accurate results in a given case is not part of the threshold admissibility determination and is a subject for the fact finder to resolve). Because McCowan only objected to the accuracy of the location estimates plotted on each map, which is a subject properly addressed through cross-examination and left for the jury to decide, he has waived his challenge to the scientific reliability of the method that Verizon used to estimate the latitude and longitude of each call activity.

### B. Admissibility in General

Waiver notwithstanding, concerning the reliability and accuracy of the information, it is apparent that Detective Hopkins merely summarized and presented the information that was contained in McCowan's cell records. The evidence demonstrated that Detective Hopkins had attended four training sessions on cell phone technology between 2008 and 2012. Tr. p. 1872-73. He explained that Verizon uses a computer program to apply an algorithm to estimate location that is based on the time delay that it takes for a signal to be transmitted from the tower to the phone and back again, and the

16

phone connects through particular antennae on one of the three sectors of a tower, which each cover 120 degrees of the area around that tower. Id. at 1874, 1878, 1902-03, 1913-14. Detective Hopkins observed that particular estimates were as close as twenty-one feet and as far as a mile or more from McCowan's known location but that the estimates clustered around the known location. Id. at 1879, 1908, 1918, 1920-26, 1961-62, 1965-66, 1988.

Although Detective Hopkins did not personally perform any calculations or analysis to render an opinion about the location of McCowan's phone, he provided contextual testimony explaining cell phone networks and location estimates and plotting estimated locations from Verizon's record on maps. Detective Hopkins did not offer any expert opinion testimony, but testified based on his specialized training about general principles to help the jury understand the information contained in Verizon's records. However, he did not perform any calculations or analysis of McCowan's cell phone records to reach an opinion about McCowan's location.

Moreover, McCowan's complaint that the estimates may have been influenced by factors such as signal strength and local topography are not so much challenges to the reliability of the method that Verizon used to estimate the location of the telephone as they are challenges to the accuracy of the particular results that process produced in this case. Indeed, McCowan does not so much dispute the scientific validity of mathematically calculating an estimate of the location of an object based on the time it takes for a signal to travel to and from a fixed point. Rather, McCowan's primary

17

challenge is to whether those calculations produced accurate estimates of his locations at various relevant times.

In light of the above, it is apparent that the jury had more than sufficient information to assess the accuracy of particular location results or sets of results in this case. Therefore, we believe that the trial court correctly determined that any dispute regarding the accuracy of the estimates went to the weight rather than to the admissibility of the evidence and should be addressed through cross-examination. Tr. p. 1884.

And McCowan indeed challenged the accuracy of the estimates through both cross-examination and his own expert witness's testimony. In fact, McCowan had engaged a former State Trooper who performed his own analysis to estimate the location of McCowan's phone and was of the opinion that McCowan was actually at his residence during the period in which his phone appeared to have moved towards the Store and back. Tr. p. 2316-18. Such evidence permitted the factfinder to weigh the evidence and judge the witnesses. For these reasons, the trial court did not err in admitting Detective Hopkins's testimony regarding the reliability and accuracy of the location of McCowan's phone.

### C. Indiana Constitution

We further note that even though McCowan has also waived his arguments under the Indiana Constitution, the trial court correctly determined that McCowan was not entitled to suppression of his phone records on this basis, even if proper objections had been made.

18

"The legality of a governmental search under our constitution turns on an evaluation of the reasonableness of police conduct under the totality of the circumstances." Brooks v. State, 934 N.E.2d 1234, 1242 (Ind. Ct. App. 2010), trans. denied. Under Article I, Section 11, several factors are considered in determining the reasonableness of a warrantless search: "1) the degree of concern, suspicion, or knowledge that a violation has occurred; 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and 3) the extent of law enforcement needs." Litchfield v. State, 824 N.E.2d 356, 361 (Ind. 2005).

In this case, the police developed a great degree of suspicion and knowledge that Bach was missing, in danger, or could possibly be dead, and that McCowan likely had information about Bach's whereabouts. Bach disappeared under circumstances that strongly suggested foul play. Tr. p. 232-33, 1935. The evidence established that she was last seen with McCowan, and her vehicle was abandoned in the middle of the night, two to two and one-half miles from McCowan's home, and in a manner that was staged to appear as though she had a flat tire. Id. at 300-01, 430, 434.

The evidence further demonstrated that Bach's car door was open with keys in the ignition and her purse on the seat, but there was no trace of her. Bach had not driven there herself, as the evidence showed that it must have been driven by someone much taller, like McCowan.

As discussed above, McCowan admitted that Bach was still at his house around 1:00 a.m. McCowan's neighbor heard a man repeatedly say, "Amanda, get up," and

19

heard a woman respond, "I can't believe this is happening." Tr. p. 396-98. The police knew that McCowan had left the county that afternoon, only hours after Bach was discovered missing. In light of these circumstances, the police had many reasons to believe that Bach had been the victim of a violent crime.

The evidence also demonstrated that the police had good reason to believe that information about McCowan's communications and movements on the day of Bach's disappearance would provide them with information about what happened to Bach. Moreover, the degree of intrusion into McCowan's life was minimal. The police requested records maintained by McCowan's cell phone provider as a routine part of their recordkeeping. We agree with the trial court's determination that this request did not require McCowan to surrender his phone and did not cause any intrusion upon his person or property. McCowan has not shown that the request disrupted his activities, as evidenced by the fact that he was attending parties in Bloomington at the time of the request. This amounted to a limited request for information that McCowan had essentially already provided to a third party. See In re U.S. for Historical Cell Site Data, 724 F.3d 600, 614 (5th Cir. 2013) (holding that the government was not required to obtain a warrant to obtain certain cellular data including location information from the cell phone company because the phone user has no reasonable expectation of privacy in that information that they voluntarily convey to the service provider and that the provider maintains in its records for its own purposes).

In this case, the police only requested information about McCowan's telephone activity between midnight and the time of the request, around 6:30 p.m., on Friday, the day that Bach went missing. Thus, the request and any resulting intrusion upon McCowan's life were tailored to the exigencies of the situation and the compelling needs of law enforcement.

Additionally, the extent of law enforcement needs was great when the request was made, insofar as the police were searching for a recently missing individual who could be in danger or had been the victim of foul play. The request for the telephone information was made on the day that McCowan disappeared, while police were following various tips, trying to secure Bach's car, searching for Bach, and organizing a ground search for the following morning.

In addition to the above, we reject McCowan's reliance on Kirk v. State, 974 N.E.2d 1059 (Ind. Ct. App. 2012), trans. denied. In that case, the police arrested Kirk, found his cell phone during a search of his person incident to arrest, and immediately opened the phone and began reading Kirk's text messages. Id. at 1070-71. However, the officers had no reason to believe that the phone contained evidence of a crime, there was no particular explanation as to why they chose to look at the messages, and no need was established to access the content of the phone immediately rather than waiting to obtain a warrant. Id. at 1071.

Unlike the circumstances in Kirk, McCowan has not preserved a constitutional challenge to the police obtaining the content of his text messages through his telephone

21

records in this case. Even more compelling, the police had the immediate need to act quickly without obtaining a warrant and to believe that McCowan's phone records might produce evidence of a crime or Bach's whereabouts. As a result, contrary to <u>Kirk</u>, law enforcement needs were great in this case, and the intrusion into McCowan's life was minimal. In short, the emergency request for McCowan's phone records was reasonable and did not violate the Indiana Constitution.

For all these reasons, we conclude that even if McCowan had not waived the issue, the trial court properly admitted the phone records into evidence and McCowan's rights were not violated under Article I, Section 11 of the Indiana Constitution.

## II. Refused Final Instruction—Presumption of Innocence

McCowan next argues that the trial court erred in refusing to give his proffered jury instruction regarding the presumption of innocence. McCowan asserts that the trial court was specifically required to "inform the jury of its duty to reconcile evidence with the presumption if it can reasonably do so." Appellant's Br. p. 10. Because the trial court allegedly failed to satisfy that requirement in the instruction that it gave, McCowan asserts that his proposed instruction would have cured the defect.

In resolving this issue, we note that the trial court has broad discretion in the manner of instructing the jury, and we will review its decision only for an abuse of that discretion. <u>Snell v. State</u>, 866 N.E.2d 392, 395 (Ind. Ct. App. 2007). The purpose of an instruction is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct

22

verdict. Id. at 396. In determining whether the trial court abused its discretion by declining to give a tendered instruction, we consider: 1) whether the tendered instruction correctly states the law; 2) whether there was evidence presented at trial to support giving the instruction; and 3) whether the substance of the instruction was covered by other instructions that were given. Lampkins v. State, 778 N.E.2d 1248, 1253 (Ind. 2002). The ruling of the trial court will not be reversed unless the instructions as a whole misstate the law or mislead the jury. Snell, 866 N.E.2d at 396.

Our Supreme Court has determined that "[a]n instruction . . . which advises the jury that the presumption of innocence prevails until the close of the trial, and that it is the duty of the jury to reconcile the evidence upon the theory of the defendant's innocence if they could do so, must be given if requested." Robey v. State, 454 N.E.2d 1221, 1222 (Ind. 1983). McCowan's proposed instruction in this case addresses the second concept, as follows:

> You should attempt to fit the evidence to the presumption that the accused is innocent.
>
> If the evidence in this case is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and once [sic] of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence, and reject that which points to his guilt.
>
> You will notice that this rule applies only when both of the two possible opposing conclusions appear to you to be reasonable. If, on the other hand, one of the possible conclusions should appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable, bearing in mind, however, that even if the reasonable

23

deduction point to defendant's guilt, the entire proof must carry the convincing force required by law to support a verdict of guilt.

Appellant's App. p. 297.

In this case, the trial court refused the instruction because the substance of the instruction was covered by the court's other instructions. Appellant's App. p. 297, Tr. p. 2401. In Robey, our Supreme Court considered an instruction that was given by the trial court that contained, in part, the above language and held that the instruction as a whole adequately instructed the jury on the presumption of innocence. Robey, 454 N.E.2d at 1222. On the other hand, we have previously considered proposed instructions that contained only the first paragraph above and have determined that it is not a correct statement of the law without the accompanying second paragraph. Matheny v. State, 983 N.E.2d 672, 679-80 (Ind. Ct. App. 2013), trans. denied.

In addressing McCowan's claims, we note that the substance of the instruction that the trial court refused to give was, indeed, covered by other instructions. For instance, in both the preliminary and final instructions, the trial court instructed the jury on the presumption of innocence and the State's burden to prove each element of the crime beyond a reasonable doubt. More specifically, the jury was instructed to "keep an open mind. You should not form or express any conclusion or judgment about the outcome of the case until I submit the case to you for your deliberations." Appellant's App. p. 260. The jury was also instructed to consider all of the instructions as a whole and not to

24

single out or ignore any instruction.  Id. at 263, 320.  Furthermore, the trial court instructed the jury that:

> Under the law of this state, a person charged with a crime is presumed to be innocent.  To overcome the presumption of innocence, the State must prove the Defendant guilty of each element of the crime charged, beyond a reasonable doubt.
>
> The Defendant is not required to present any evidence to prove his innocence or to prove or explain anything.

Id. at 267, 329.  The jury was reminded in each instruction identifying the elements of the offense that "before you may convict the Defendant, the State must prove each of the [elements of the offense] beyond a reasonable doubt" and that if the State failed to prove any element beyond a reasonable doubt, "you must find the Defendant not guilty."  Id. at 265, 324.  The trial court also provided guidance on the difference between a reasonable doubt and doubts that are merely speculative or unreasonable.  The trial court explained that "[a] reasonable doubt is a fair, actual, and logical doubt based upon reason and common sense."  Id. at 268, 330.

The trial court's instructions further explained that a "[r]easonable doubt exists when you are not firmly convinced of the Defendant's guilt, after you have weighed and considered all the evidence."  Id. at 268, 330.  The trial court informed the jury that if they had a reasonable doubt, that they "must give the Defendant the benefit of the doubt and find the Defendant not guilty."  Id. at 268, 330.

Taken in conjunction with the remainder of the trial court's instructions that provided additional context to the State's burden of proof and the jury's duty and power

25

to judge and weigh evidence, we believe that the trial court adequately informed the jury of the essence of McCowan's proposed instruction. Although the instructions may not have expressly stated that the jury "must attempt to fit the evidence to a theory of innocence," we believe that the detailed instructions given as a whole satisfied the requirement set forth in Robey that the substance of the instructions that the trial court gave "adequately directed the jury to receive and evaluate the trial evidence while in the posture of presuming the defendant innocent and demanding of the State that it produce strong and persuasive evidence of guilt wholly at odds with innocence." Robey, 454 N.E.2d at 1222.

Although this court in Lee v. State, 964 N.E.2d 859, 865 (Ind. Ct. App. 2012), trans. denied, held that instructions are inadequate when they do not state that the jury must endeavor to fit the evidence to a theory of innocence, McCowan's instruction would not have informed the jury that the presumption continues through trial. More specifically, the instruction tendered in Lee that the trial court refused to give provided that

> Under the law of this state, a person charged with a crime is presumed to be innocent. This presumption continues in favor of the accused throughout the trial of this cause. To overcome the presumption of innocence, the [S]tate must prove the Defendant guilty of each essential element of the crime charged, beyond a reasonable doubt.
>
> The Defendant is not required to present any evidence to prove his/her innocence or to prove or explain anything.

26

You should attempt to fit the evidence to the presumption that the Defendant is innocent.

If the evidence in this case is susceptible of two (2) constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the Defendant, and the other to his/her innocence, it is your duty, under the law to adopt that interpretation which is consistent with the Defendant's innocence, and reject that which points to his/her guilt.

Id. at 863. The tendered instruction cited to our Supreme Court's decision in Robey.

The instructions that were actually given by the trial court in this case were far more detailed than those given by the court in Lee. That said, we have recently determined that instructions nearly identical to those that the trial court gave in this case adequately conveyed the substance of the proposed instruction in other cases. Santiago v. State, 985 N.E.2d 760, 762 (Ind. Ct. App. 2013), trans. denied. Put another way, in Santiago, it was determined that "Robey simply requires instructing the jury that it should fit the evidence to the presumption that a defendant is innocent." Id. at 763. We reasoned that because the trial court's instructions as a whole that were given in Santiago were very similar to the instructions given in this case and satisfied the requirement in Robey, the trial court did not err in refusing to give the precise instruction that McCowan had tendered. Id.

Like the instructions given in Santiago, the detailed instructions that the trial court gave in this case adequately explained that McCowan must be presumed innocent unless and until that presumption was overcome by evidence of each element proven beyond a

27

reasonable doubt and that any reasonable doubt must go to McCowan's benefit and result in a finding of not guilty.

Although we have recognized language like that contained in McCowan's proposed instruction as an accurate statement of the law, it is apparent that the trial court's instructions given in this case accurately and adequately informed the jury of the presumption of innocence, the State's burden to prove all of the elements of the charged offense beyond a reasonable doubt, and the jury's power and duty to evaluate the evidence. Thus, McCowan's claim fails.

### III. Recusal of Trial Judge

McCowan claims that the trial court should have granted his motion to correct error and recused itself from the case because it did not disclose an ex parte communication to him after it received the jury's verdict but prior to sentencing. McCowan points out that a telephone recording between McCowan and a relative occurred prior to sentencing where the relative indicated that "since the police, the prosecution and the trial judge had in effect let the real murderer go free in this case, those parties deserved to have their own children murdered." Appellant's Br. p. 11. Because the sheriff had provided the trial court with the recording, McCowan contends that it should have been disclosed to defense counsel, and that the failure to do so amounted to improper ex parte communication, was prejudicial, and that his conviction must be reversed.

28

It is within the discretion of the trial court to grant a change of judge at the sentencing stage of a criminal prosecution. Thakkar v. State, 644 N.E.2d 609, 611 (Ind. Ct. App. 1994).

A reviewing court may reverse a denial of a change only for an abuse of that discretion. Johnson v. State 472 N.E.2d 892, 911 (Ind. 1985). In Wallace v. State, 486 N.E.2d 445, 456 (Ind. 1985), it was determined that reversal will lie for bias and prejudice where the trial judge has expressed an opinion upon the merits of the controversy before him.

> At the sentencing hearing, the prosecutor referenced the call and stated
>
> Dustin McCowan is the way he is because of the adults in his life. They are dishonest, cowardly, and frankly, pathetic. They're pathetic because as this family grieves the loss of their child, this family wishes the murder of our children; your children, my children, Mr. Frost's children and Commander Biggs' children.

Sent. Tr. p. 7. Before pronouncing the sentence, the trial court responded to the State's argument as follows:

> And I look through this, and I heard the argument that Ms. Polarke gave, and I heard her make reference to the defendant's family in one respect. And I don't consider that at all in this decision that I'll be making here shortly. But I will simply say that phone conversations from the Porter County Jail between a prisoner and anyone on the outside are recorded. Those people know that they are recorded before the recording begins. And in one of the recordings that was made of the telephone call to Mr. McCowan, the person on the other end indicated that it would be appropriate if the deputy prosecuting attorneys, Ms. Polarke and Mr. Frost's children were killed so that they would know what this is all about. I think they also went further than that, and as I said, whenever the sheriff's department determines that they hear something that could conceivably be a threat to the court or the participants in there, we are informed of that. And that's what happened here. But that will not be considered by me in this sentencing because, Dustin, to

> his credit said, no, that he didn't really think that would be the case.  Not in that many words, but that's what he said.

Id. at 48-49 (emphasis added).

McCowan did not object to the trial court's reference to the phone call or to the trial court continuing to preside and impose sentence.  Rather, McCowan waited three weeks and filed a motion to correct error alleging that the trial judge should have recused himself sua sponte.

The trial court denied the motion, finding that there was no improper ex parte communication, that no real threat existed, and that McCowan's response to the statements was akin to a mitigating factor.  The trial court's order also indicates that the call was played for defense counsel in chambers.

We also note that McCowan has waived any claim that he was entitled to a change of judge in light of the provision under Indiana Criminal Rule 12 (Rule 12), which generally governs a request for a change of judge.  More specifically, in a felony case, Rule 12 permits a party to request a change of judge for bias or prejudice by filing an affidavit listing the historical facts supporting a belief that the judge has a personal bias or prejudice against the party.

As noted above, McCowan did not request a change of judge or object to the judge's decision to continue to preside at sentencing, even after he learned that the judge had been informed of his jail phone call.  Instead, McCowan first raised the issue by way of a post-sentencing motion to correct error.  McCowan also makes no argument on

appeal that he was entitled to a change of judge under the rule or that the judge had personal bias or prejudice against him.  Thus, McCowan's claim is also waived on this basis.  See Angleton v. State, 714 N.E.2d 156, 158 (Ind. 1999) (holding that the failure to lodge timely objection to change of judge waives any claim of error on appeal).

However in an effort to avoid waiver, McCowan directs us to Indiana Code of Judicial Conduct Rule 2.11(A), which provides that

> (A) A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to the following circumstances:
>
> (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of facts that are in dispute in the proceeding.

The appearance of bias and partiality requires recusal just as does the actual existence of those impediments. Patterson v. State, 926 N.E.2d 90, 94 (Ind. Ct. App. 2010).   The question is whether an objective person, knowledgeable of all the circumstances, would have a rational basis for doubting the judge's impartiality.  Id.   In other words, the question is not whether the judge's impartiality is impaired in fact, but whether there exists a reasonable basis for questioning a judge's impartiality.  Bell v. State, 655 N.E.2d 129, 132 (Ind. Ct. App. 1995).

Generally, the Code of Judicial conduct prohibits a judge from engaging in ex parte conversations which relate to pending proceedings.  James v. State, 716 N.E.2d 935, 940-41 (Ind. 1999).   Ex parte communications are a "generally prohibited communication between counsel and the court when opposing counsel is not present."

Worman Enterprises, Inc. v. Boone Cnty. Solid Waste Mgmt. Dist., 805 N.E.2d 369, 374-75 (Ind. 2004). A judge has also been found to violate the prohibition when speaking and providing legal advice to a key witness against a defendant without informing the defendant of the substance of those conversations. Bell, 655 N.E.2d at 131-32.

In this case, there is no evidence that the trial court engaged in an extra-judicial discussion with counsel for either party or a witness during the proceedings. It is undisputed that it was the sheriff who informed the trial court that there was information about a possible threat contained in the jail call. Sent. Tr. p. 48-49; appellant's app. p. 358. The call and potential threat were incidentally related to the proceedings. In other words, the communication did not concern any action that might need to be taken in the case itself, and there was no reason to suspect that the call's existence or contents would become evidence in the case. The trial judge did not have any information that directly pertained to a matter over which he would preside or an issue about which he would have to render a ruling. In our view, this was simply not the kind of ex parte communication contemplated by the rule.

Also, this communication concerned an emergency, which is an exception to ex parte communications. James, 716 N.E.2d at 941.[2] The trial court was informed about the call because the individual speaking to McCowan made statements that could be

---

[2] While the Code of Judicial Conduct prohibits a judge from engaging in ex parte conversations that relate to pending proceedings, we note that an exception to this general rule is found under Judicial Canon 2.9 (A)(1), which permits ex parte communications for scheduling, administrative purposes, or emergencies that do not deal with substantive matters of a pending case. Under this exception, the judge must: (a) reasonably believe that no party will gain a procedural or tactical advantage and (b) promptly notify all other parties of the substance of the ex parte communication and allow an opportunity to respond.

interpreted as threats against the children of a lead investigating detective, two prosecuting attorneys, and the judge. Also, there was no risk that either party would gain a practical or tactical advantage in the case as a result of the judge being informed of the call. Even more compelling, the circumstances in this case do not create any reasonable basis for doubting the trial court's impartiality. And the potentially threatening and disparaging statements were not made by McCowan; rather, they were made by the unidentified caller to whom he was speaking. The trial court determined that the statements did not amount to actual threats. Furthermore, McCowan rejected the caller's threatening statements, which is a reaction that the trial court found "to his credit." Sent. Tr. p. 48-49.

As is apparent from the above, the trial court also expressly refused to consider any of that information or the prosecutor's arguments about McCowan's family at sentencing. Here, there was nothing about the situation that would cause a reasonable person to doubt the trial court's impartiality, and the record clearly indicates that the trial court's sentencing decision was not actually influenced by the information. For all these reasons, we conclude that the trial court properly denied McCowan's motion to correct error, alleging that the trial court engaged in any improper ex parte communications.

## CONCLUSION

In light of our discussion above, we conclude that McCowan has waived his challenges to the admissibility of his cell phone records including the text messages that were contained in those records because he failed to properly object to their admissibility.

33

McCowan further waived his claims regarding the location estimates as to where the calls and texts were made for the same reason. Waiver notwithstanding, the trial court properly admitted the records, and found that any dispute about the accuracy of the location estimates were for the jury to resolve.

Additionally, under the totality of the circumstances and in light of the emergency situation, the police officers did not violate McCowan's constitutional rights under Article I, Section 11 of the Indiana Constitution by conducting a warrantless search of his cell phone records.

We also conclude that the trial court did not err in refusing to give McCowan's tendered instruction on the presumption of innocence because the trial court's instructions as a whole adequately informed the jurors of the presumption of innocence and their duty to give McCowan the benefit of any reasonable doubt when deliberating. Finally, we conclude that the trial court did not engage in any improper ex parte communication and recusal was not required.

The judgment of the trial court is affirmed.

NAJAM, J., and BROWN, J., concur.