


FILED

Dec 22 2025, 10:09 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# Court of Appeals of Indiana

Christopher T. Tandy,

*Appellant-Defendant*

v.

State of Indiana,

*Appellee-Plaintiff*

---

December 22, 2025

Court of Appeals Case No.
25A-CR-97

Appeal from the Clark Circuit Court

The Honorable Vicki L. Carmichael, Special Judge

Trial Court Cause No.
10C04-2107-MR-5

---

**Opinion by Judge DeBoer**
Judge Scheele concurs.
Judge Tavitas dissents with separate opinion.

**DeBoer, Judge.**

## Case Summary

[1] On July 23, 2021, Roderick Wallace was found dead on the side of a road in Jeffersonville. He had been shot six times. Later that day, his vehicle was found abandoned in Louisville, Kentucky. The inside of the vehicle was caked with blood and contained Tandy's DNA, spent shell casings, and Wallace's phone which showed that he and Tandy were planning to meet for a drug deal in the early morning hours of July 23—around the time Wallace was killed.

[2] The State charged Tandy with various crimes, including auto theft as a Level 6 felony and murder. At Tandy's jury trial, the trial court allowed a detective to testify about cell site location information (CSLI) obtained from Tandy's and Wallace's phones. The court also admitted a graphic autopsy photograph of Wallace. The jury found Tandy guilty of murder and auto theft. Before sentencing, Tandy filed a motion for relief from judgment alleging prosecutorial misconduct. Specifically, he claimed the deputy prosecuting attorney had contacted Wallace's roommate before trial and informed him that Tandy's attorney believed the roommate had murdered Wallace, thereby discouraging the potential witness from speaking with the defense. The trial court denied his motion. Tandy now appeals, raising three issues for our review:

> (1) Whether the trial court abused its discretion in permitting the detective to testify regarding CSLI in violation of Indiana Evidence Rule 702.

(2) Whether the trial court abused its discretion in admitting the autopsy photograph into evidence.

(3) Whether the trial court erred in denying Tandy's motion for relief from judgment due to prosecutorial misconduct.

We affirm.

## Facts and Procedural History[1]

On July 16, 2021, Tandy and Wallace met for the first time at a park in Jeffersonville while attending a Space Jam 2 watch party. The following week, Wallace and Tandy met up a few times so Tandy could purchase marijuana from Wallace. At the time, Tandy was in a relationship with Aniecia Love, and he would occasionally stay at her apartment in Jeffersonville. Because Tandy did not have a vehicle, he gave Love's address to Wallace to complete a sale.

On July 22, Tandy arrived at Love's apartment around 7:00 or 8:00 p.m. Love put her son to bed around 10:00 p.m., then went to sleep. Tandy was there when she fell asleep but not when she woke up around 4:00 a.m. Though she

---

[1] We held a traveling oral argument in this case on November 6, 2025, at Valparaiso High School. We thank counsel for their zealous oral and written advocacy and extend our gratitude to Valparaiso High School for hosting the event, as well as to the attendees for their thoughtful questions posed to the panel and counsel after the argument.

never saw him again, Tandy called Love days later and "it sounded like [] he said he killed somebody[.]" Transcript Vol. 3 at 121.

[5] On July 23, police were informed that a body had been found on Wildwood Drive in Jeffersonville. The deceased man, later identified as Wallace, had sustained six gunshot wounds to the head. He appeared to have been shot at another location and then dumped on the side of the road.

[6] Later that day, police located Wallace's white 2008 Chevrolet Impala in the backyard of a church in Louisville, Kentucky. Wallace's wallet, ID, glasses, work credential, and a bloodied hat were found in the area. His cell phone and at least six spent shell casings were in the blood-stained interior of the car. The blood was concentrated around the driver's seat and pooled on the floor behind the center console. Tandy's fingerprints were found on the passenger window, and his DNA was found on the gear shift, the steering wheel, and the brim of the hat found near Wallace's car.

[7] Wallace's phone contained text messages between himself and Tandy from the day they met through the morning Wallace died. Their initial messages were cordial and concerned their drug deals. Early on, Tandy gave Love's address to Wallace, and he later provided another address in the West End of Louisville.[2] In the early morning hours of July 23, their conversation became hostile.

---

[2] The Louisville address Tandy provided was "within [] 2 miles-ish" of where Wallace's abandoned car was located. Transcript Vol. 3 at 30.

Around 3:00 a.m., Wallace told Tandy he was "waiting for [him,]" and Tandy responded that Wallace needed to "calm down[.]" Exhibits Vol. 10 at 73. When Wallace asked how long Tandy would be and told him he was "in [Tandy's] parking lot where [he] was last time[,]" Tandy responded, "U know what u treating me like I'm a bi***[.]" *Id.* [sic throughout]. The two continued to argue before Tandy texted "[']b]out to pull in" and "I never fu**** u over always kept money st8 quit talking to me like a peasent" at 3:55 a.m. Ex. Vol. 11 at 2 [sic throughout]. Tandy texted Wallace for the last time at 4:28 a.m.

[8] The data recovered from Tandy's and Wallace's cell phones and a doorbell camera near Love's apartment showed the following:

- Wallace called Tandy at 11:51 p.m., and his phone connected to a cell tower in the West End area of Louisville while Tandy's connected to a tower in Jeffersonville near Love's apartment.

- When Wallace called Tandy again at 1:16 and 1:55 a.m., their phones connected to towers in the same proximity of their earlier call.

- At 2:33 a.m., the doorbell camera captured a car resembling Wallace's white Impala driving toward Love's apartment complex.

- Wallace called Tandy again at 3:01 and 3:06 a.m., and this time both phones were picked up by towers in Jeffersonville near Love's apartment.

- Tandy then called an unidentified number two times, once at 3:16 and then at 3:33 a.m., before Wallace called him again at 3:42 a.m. All three of these calls were picked up by the same tower in Jeffersonville.

- At 4:32 a.m., the same doorbell camera recorded the white car traveling away from Love's apartment complex.

- Wallace's phone did not make any other outgoing calls, but it received an incoming call that morning at 10:53 a.m., which was picked up by a tower near where his car was later discovered in Louisville.

- Tandy's phone made several calls from 4:40 a.m. to 4:46 a.m. As the calls progressed, Tandy's phone moved from an area near Love's apartment toward a bridge to Louisville.

[9]     On July 30, 2021, and as later amended, the State charged Tandy with Count I: Murder, a felony;[3] Count II: Auto Theft, a Level 6 felony;[4] and Count III: Unlawful Possession of a Firearm by a Serious Violent Felon, a Level 4 felony.[5]

---

[3] Ind. Code § 35-42-1-1(1).

[4] I.C. § 35-43-4-2(a)(1)(B)(i). The amended information cited subpart (B)(ii), but that subpart references theft of a "component part" of a vehicle, and it is undisputed that the State intended to charge him for the theft of Wallace's entire vehicle. *See* Appellant's Appendix Vol. 2 at 66.

[5] I.C. § 35-47-4-5(c).

The State separately alleged that Tandy was eligible for a sentencing enhancement because he used a firearm to commit the murder.[6]

[10] Shortly before trial, defense counsel subpoenaed Wallace's roommate, Aaron Martin, for a deposition. After Martin failed to appear for his deposition, the deputy prosecutor called him and told him that Tandy's attorney had "made statements to another witness that he believed [] [Martin] committed this murder[.]" Tr. Vol. 5 at 169. Martin was "reluctant" to talk to Tandy's attorney but ended up speaking with him before trial. *Id.* at 166. Although he was subpoenaed by Tandy and appeared for trial, Martin was never called to testify.

[11] The six-day jury trial began on September 24, 2024. During its case-in-chief, the State entered six autopsy photographs into evidence. *See* Ex. Vol. 10 at 9-14. State's Exhibit 267, a photograph depicting Wallace's scalp removed and pulled over his face to reveal his severely damaged skull, was admitted over Tandy's objection that the photo was "gruesome and inflammatory[.]" Tr. Vol. 4 at 138; *see* Ex. Vol. 10 at 12.

[12] Dr. James Jacobi, the forensic pathologist who performed Wallace's autopsy, testified about the photograph and explained:

---

[6] I.C. § 35-50-2-11(d). The State's "Notice of Intent to Seek Enhanced Penalty for Firearm Use" referenced subsection (c) of the statute, but that subsection refers to the definition of a police officer, and it seems apparent and is not disputed that the State intended to seek the enhancement provided under subsection (d). *See* Appellant's App. Vol. 2 at 67.

A: This is a scalp has [sic] been pulled down and I have a wooden probe probing the gunshot wound which is located above the ear but is hidden from the previous picture by the hairline.

Q: What's the purpose of the probe in that photograph?

A: This demonstrates the trajectory or the path. This was obviously the skull cap has been removed and then it's been replaced.

Q: Alright. Does it also show the . . . impact area, the damage to the skull?

A: Yes, the probe is passing through a hole in the skull, caused by a bullet.

Tr. Vol. 4 at 159.

[13] The State also called Detective Cody Richardson to testify about his analysis of Tandy's and Wallace's CSLI. He discussed his training and experience in cell site analysis and explained that the practice involves using historical records and geolocation data provided by cellular companies—here, Verizon and T-Mobile—and "placing those on a map in order to ascertain an approximate location of where a device may have been." Tr. Vol. 5 at 10. The detective testified that cell phones "always . . . scan[] the network looking for the best quality signal . . . so that whenever you pick up your phone, to make a voice call, send a text[,] scroll on social media, [or] send an e-mail, your phone knows which tower and sector to communicate with[.]" *Id.* at 18-19.

Earlier in the trial, Tandy raised a preliminary objection to Detective Richardson's use of a demonstrative PowerPoint to aid his testimony. The PowerPoint, among other information about cell site analysis, included various graphics like the following:



Ex. Vol. 11 at 60.

In his initial objection Tandy argued that the "pie wedge" diagrams used to map the CSLI were "misleading" and suggested the phone's location was "far more specific and determinate than it [was.]" Tr. Vol. 3 at 198. The trial court decided these arguments went to the weight of the evidence, not its admissibility. After the State laid the foundation for Detective Richardson's

testimony about the CSLI, the court allowed defense counsel to voir dire him about the accuracy of the results produced by the "ZetX" or "Trax" software he used to prepare his PowerPoint presentation. The detective acknowledged it was possible for a phone to be located outside of the demonstrative pie wedge. Tandy then unsuccessfully objected to admission and publication of the PowerPoint "on the basis of the unreliability of the science," though he later convinced the trial court that the PowerPoint was merely "demonstrative of [Detective Richardson's] testimony" and neither admissible as substantive evidence nor "allowed to go back with the jury" during its deliberation. *Id.* at 17, 70, 119.

[16] During cross-examination, defense counsel questioned Detective Richardson about his training and experience with cell site analysis, how the Trax program produced maps, and whether he double-checked the program's output for accuracy. The detective again acknowledged that the wedges depicted in the PowerPoint did not reflect the "exact location of th[e] device" or the "absolute boundary" of where the phone could be located. *Id.* at 47, 48.

[17] The jury ultimately found Tandy guilty of murder and auto theft, and determined he was eligible for a firearm sentencing enhancement.[7] Before sentencing, Tandy filed a motion for relief from judgment pursuant to Trial Rule 60(B), arguing his convictions should be set aside, in part, because the

---

[7] Tandy waived his right to a jury trial on the unlawful possession of a firearm count, and the court entered a judgment of acquittal on that offense due to double jeopardy concerns.

deputy prosecutor had committed misconduct by "discouraging [Martin] from talking with or otherwise cooperating with" the defense.[8]  Appellant's Appendix Vol. 3 at 108.  The trial court set a hearing, took Martin's testimony, and denied Tandy's motion.  The court sentenced Tandy to serve an aggregate term of sixty-five years in the Department of Correction.

## Discussion and Decision

## 1. Cell Site Location Information (CSLI)

[18]  Tandy argues that the trial court erroneously allowed Detective Richardson to present unreliable expert testimony regarding his and Wallace's CSLI.  *See* Ind. Rule Evid. 702(b) ("Expert scientific testimony is admissible only if . . . the expert testimony rests upon reliable scientific principles.").  In essence, he asserts that because the State did not establish the Trax software rested on reliable scientific principles, and the maps it produced served as the basis of the detective's testimony, his testimony was therefore unreliable.  He points to various scholarly articles and a Colorado trial court decision in support of his claim.

[19]  Our review of a trial court's decision to admit or exclude evidence is limited to whether the court abused its discretion.  *Satterfield v. State*, 33 N.E.3d 344, 352

---

[8] Tandy's motion also alleged that Love's testimony, particularly her assertion that Tandy told her he killed someone, was obtained through coercion.  However, when Love testified at the hearing on Tandy's motion for relief from judgment, she unequivocally denied that her testimony was forced "by anybody."  Tr. Vol. 5 at 174.  Nonetheless, Tandy does not address this aspect of his motion for relief from judgment on appeal.

(Ind. 2015). "We will reverse only if the trial court's ruling was clearly against the logic and effect of the facts and circumstances before it and the error[] affect[s] a party's substantial rights." *Jones v. State*, 258 N.E.3d 1063, 1075 (Ind. Ct. App. 2025), *trans. denied*.

## A. Waiver

[20] The State first contends Tandy waived this argument because he objected on a different basis at trial. *See Hunter v. State*, 72 N.E.3d 928, 932 (Ind. Ct. App. 2017) ("Any grounds for objections not raised at trial are not available on appeal, and a party may not add to or change his grounds in the reviewing court."), *trans. denied*. We agree.

[21] On the third day of trial, Tandy raised a preliminary objection to Detective Richardson's anticipated use of a demonstrative exhibit. *See* Tr. Vol. 3 at 198-203. The substance of that objection was that the PowerPoint's "pie wedge" diagrams could be "misleading" because they created "a much more profound and damning exhibit than the actual information justifies." *Id.* at 198-99. While defense counsel indicated Detective Richardson should not be able to use the PowerPoint at all, he "want[ed] to be sure that . . . it d[idn't] go back with the jury during deliberations because that [would] take[] some of the sting out of [] the problematic aspects of it." *Id.* at 201.

[22] On the last day of trial, Detective Richardson testified about the CSLI recovered from Tandy's and Wallace's phones. After he discussed his training and experience in cell site analysis, Tandy's attorney asked the trial court for

permission to voir dire the detective in front of the jury. The court obliged, and Tandy's attorney asked the detective about his training, credentials, and the Trax software. While the attorney asked a few questions about "the reliability of the software[,]" he clarified that the "specific complaint about th[e] software [was] that the map makes [the location of the device] look far more certain and specific . . . th[an] is justified by the actual data[.]" Tr. Vol. 5 at 14, 15. At the end of the questioning, Tandy's attorney said he would "save the rest for cross," and the detective's testimony continued. *Id.* at 17. However, when the State sought to admit and publish Detective Richardson's PowerPoint, Tandy's attorney unsuccessfully objected "on the basis of the unreliability of the science[.]" *Id.*

[23] Given that the substance of Tandy's preliminary objection and voir dire questioning primarily concerned the accuracy of the maps and lacked inquiry into the typical factors considered in determining whether expert testimony rests on reliable scientific principles, and that his contemporaneous objection was intended to exclude the PowerPoint rather than Detective Richardson's testimony, the State is correct that Tandy "did not object to Detective Richardson's testimony, just the potentially misleading nature of the demonstrative exhibit." Appellee's Brief at 19; s*ee Hastings v. State*, 58 N.E.3d 919, 924-25 (Ind. Ct. App. 2016) (noting admissibility under Rule 702 will center on factors such as "whether the theory or technique can be and has been tested, whether the theory has been subjected to peer review and publication, whether there is a known or potential error rate, and whether the theory has

been generally accepted within the relevant field of study"); *see also McCowan v. State*, 10 N.E.3d 522, 533 (Ind. Ct. App. 2014) (finding McCowan's purported challenge to the scientific reliability of the method that Verizon used to produce location estimates was more accurately described as a "challenge[] to the accuracy of the particular results that process produced"), *summarily aff'd in relevant part*, 27 N.E.3d 760, 768 (Ind. 2015).

[24] The dissent would find that Tandy's objection necessarily encompassed Detective Richardson's testimony because it purported to challenge the "science" that produced the depictions in the PowerPoint. But, as we note above, the record shows that defense counsel was concerned about the visual inferences created by the slides, not the admissibility of the underlying testimony. He did not ask the court to evaluate the reliability of Trax itself or request that the State be made to lay a Rule 702(b) foundation for Detective Richardson's testimony. His comment at the end of his preliminary questioning that he would "save the rest for cross" signaled that he intended to challenge the weight the jury should assign to the detective's testimony rather than its admissibility. Tr. Vol. 5 at 17. Indeed, when the State sought to publish the PowerPoint, counsel objected only to the demonstrative exhibit— not to the continuation of the detective's testimony without it. Considering all this, the record does not support the conclusion that the trial court was adequately placed on notice of any Rule 702(b) concern. *See Raess v. Doescher*, 883 N.E.2d 790, 797 (Ind. 2008) (stating that, to preserve a claim of error for

appellate review, an objection must be sufficiently specific so as to fully alert the trial court to the legal issue to be resolved), *reh'g denied*.

[25] Thus, as he raises a new question on appeal—whether Detective Richardson's testimony violated Rule 702 because the State failed to prove the Trax software was scientifically reliable—Tandy has waived this issue for our review. He also waived review of this issue for fundamental error because he did not argue fundamental error in his brief. *See Curtis v. State*, 948 N.E.2d 1143, 1148 (Ind. 2011) (finding an appellant must allege fundamental error on appeal and waives the issue if he raises it for the first time in a reply brief).

### B. Skilled Witness v. Expert Testimony

[26] Waiver notwithstanding, the State did not need to prove the heightened requirements of Rule 702 because Detective Richardson properly testified as a skilled witness. *See Jones v. State*, 957 N.E.2d 1033, 1040-41 (Ind. Ct. App. 2011) (explaining the distinction between skilled witnesses and experts, the standard for admissibility of skilled witness testimony, and what skilled witnesses may testify to).

[27] In *McCowan*, the police obtained McCowan's cell phone records from Verizon in the course of investigating his girlfriend's murder. 10 N.E.3d at 528-29. The records they received included "data about the time, date, and phone numbers for all calls and text messages made and received during [the relevant] period, information about the cell towers through which the activity was transmitted, and latitude and longitude coordinates for Verizon's estimated location of the

phone at the time of the transaction." *Id.* These records did not contain a visual representation of the coordinates for ease of juror understanding, so a detective trained in cell phone technology used a computer mapping program to plot them for hundreds of points of phone activity. *Id.* at 529. McCowan unsuccessfully moved to suppress the admission of his phone records claiming "that the scientific principles that [Verizon] used to produce the latitud[inal] and longitud[inal] coordinates were unreliable and that [the detective] was unqualified to provide expert testimony about them." *Id.* at 530.

[28] On appeal, a panel of this Court discussed this issue and held:

> Although [the detective] did not personally perform any calculations or analysis to render an opinion about the location of McCowan's phone, he provided contextual testimony explaining cell phone networks and location estimates and plotting estimated locations from Verizon's record on maps. [He] did not offer any expert opinion testimony, but testified based on his specialized training about general principles to help the jury understand the information contained in Verizon's records. However, he did not perform any calculations or analysis of McCowan's cell phone records to reach an opinion about McCowan's location.

> Moreover, McCowan's complaint that the estimates may have been influenced by factors such as signal strength and local topography are not so much challenges to the reliability of the method that Verizon used to estimate the location of the telephone as they are challenges to the accuracy of the particular results that process produced in this case. Indeed, McCowan does not so much dispute the scientific validity of mathematically calculating an estimate of the location of an object based on the time it takes for a signal to travel to and from a fixed point.

> Rather, McCowan's primary challenge is to whether those calculations produced accurate estimates of his locations at various relevant times.

*Id.* at 532-33. For these reasons, the panel agreed with the trial court that "any dispute regarding the accuracy of the estimates went to the weight rather than to the admissibility of the evidence and should be addressed through cross-examination." *Id.* at 533.

[29] Our Supreme Court adopted *McCowan's* reasoning in *Zanders v. State*, 73 N.E.3d 178, 188 (Ind. 2017) (finding an officer's explanation of CSLI evidence for the jury based on his interpretation of Sprint's computer-generated cell records was skilled witness testimony based on specialized training, not expert testimony), *cert. granted*. However, the U.S. Supreme Court granted Zanders' petition for certiorari, vacated the judgment, and remanded the case for further proceedings consistent with its opinion in *Carpenter v. United States*, 585 U.S. 296 (2018). *Zanders v. Indiana*, 585 U.S.1027 (2018). *Carpenter* answered in the affirmative the related but distinct question of "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronicle of the user's past movements." 585 U.S. at 300. On remand, the Indiana Supreme Court did not have occasion to revisit the skilled witness issue and held that admission of the CSLI evidence was harmless error. *Zanders v. State*, 118 N.E.3d 736, 756 (Ind. 2019).

[30] Accordingly, in line with *McCowan* and the direction our Supreme Court embraced in its first *Zanders* opinion, we conclude that trial court did not err in

admitting Detective Richardson's testimony as a skilled witness. Like the detectives in those cases, Detective Richardson based his testimony on his specialized training. He had over 150 hours of training in cell site analysis, had conducted cell site mapping analyses over fifty times, and had obtained various subject matter certifications. He cogently explained, among other things, the principles of cell site analysis, the data provided by the service providers, and relevant terms for location mapping analysis. *See* Tr. Vol. 5 at 18-26; Ex. Vol. 11 at 43-57.

[31] After acquainting the jury with the basics, the detective described various maps depicting Tandy's and Wallace's cellular activity on the evening of July 22 and the morning of July 23. *See* Tr. Vol. 5 at 26-31; Ex. Vol. 11 at 58-69. The mapped CSLI generally showed that Wallace's phone connected to towers in Louisville and then moved to Jeffersonville near Love's apartment complex in the early morning hours of July 23 while the two men exchanged texts and calls. Tandy's phone remained active after texts suggested the two had met and connected to towers indicating it moved toward a bridge to Louisville. Wallace's phone, however, showed no activity for hours before registering an incoming call that connected to a cell site near the location in Louisville where his vehicle and phone were ultimately recovered. Under *McCowan*, any dispute about these general location estimates went to the weight of the evidence, not its admissibility. 10 N.E.3d at 533.

[32] The dissent characterizes Trax as generating scientific conclusions that the detective could not explain, but the record does not support that

characterization. The detective testified that the underlying tower location, 120-degree cell site sector, azimuth (sector direction), and timing information came from the carriers, not Trax. When explaining the significance of the pie-wedge graphics, he testified that the shaded area "is not in any way meant to depict the approximate coverage area of that sector. That's just designed to show the way in which radiofrequency moves away from the tower." Tr. Vol. 5 at 21. He clarified that the wedges were approximations, that phones can connect from outside their boundaries, and that the carrier-provided data enabled him to manually verify "several of [the results produced by Trax] to check their accuracy." *Id.* at 45. While he testified that Tandy's and Wallace's phones connected to specific towers during specific calls, he never claimed that the pie wedges showed their phones in a specific location or a specific distance from those towers. Nothing in the detective's testimony suggests that Trax extrapolated conclusions from the carrier data. Rather, he used the software to turn the carrier data into a digestible visual for the jury—the type of interpretive assistance that *McCowan* recognized as skilled witness testimony. Thus, the dissent's concern that the CSLI mapping was produced by an opaque analytical process does not line up with how the detective testified he used Trax in this case.

[33] We further disagree with the dissent's attempt to distinguish *McCowan* on the ground that McCowan challenged the "accuracy of the particular results" produced by Verizon rather than any layer of scientific inference. 10 N.E.3d at 533. *McCowan* involved Verizon's own "algorithm" based location coordinates,

which were then plotted by the detective. *Id.* at 532. That panel did not treat Verizon's calculated estimates as scientific conclusions requiring expert testimony. Instead, it held that the detective testified as a skilled witness because he simply provided "contextual testimony" and plotted the information Verizon had generated. *Id.* at 532-33. Similarly, in this case, the carriers—not Trax—provided the data on which Detective Richardson's testimony and the demonstrative graphics relied, and the record does not indicate that Trax made inferential leaps to produce the CSLI maps. Thus, even under the dissent's framing, *McCowan* remains controlling under the facts of this case.

[34] To be sure, as in *McCowan*, Tandy utilized cross-examination to attack the accuracy of the location estimates produced by the Trax software and got Detective Richardson to concede that the pie wedges depicted in the PowerPoint did not reflect the "exact location of th[e] device" or the "absolute boundary" of where the phone could be located. Tr. Vol. 5 at 47, 48. He also successfully persuaded the trial court that the PowerPoint was merely "demonstrative of [Detective Richardson's] testimony" and neither admissible as substantive evidence nor "allowed to go back with the jury" during its deliberation. *Id.* at 70, 119.

### C. Harmless Error

[35] Finally, even if the trial court erred in admitting all or part of Detective Richardson's CSLI testimony, such error was harmless. Under Appellate Rule 66(A), "[n]o error or defect in any ruling or order . . . is ground for . . . reversal on appeal where its probable impact, in light of all the evidence in the case, is

sufficiently minor so as not to affect the substantial rights of the parties." *See Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023) (noting Rule 66(A)'s probable impact test is "not a review for the sufficiency of the remaining evidence; it is a review of what was presented to the trier of fact compared to what should have been presented" considering "the likely impact of the improperly admitted or excluded evidence on a reasonable, average jury in light of all the evidence in the case"), *reh'g denied*, *cert. denied*.

[36] While the dissent views the CSLI mapping as pivotal, the record demonstrates otherwise. The physical evidence alone strongly implicated Tandy. His DNA was on the steering wheel, gear shift, and blood-spattered hat, and his fingerprints were on the passenger window of Wallace's vehicle found abandoned near a Louisville address associated with Tandy. The text messages between the two men showed their conversation became hostile shortly before they planned to meet up and Wallace was killed. Moreover, doorbell-camera footage placed a vehicle matching Wallace's entering and leaving the area of Love's apartment at the relevant times. And when Love awoke on the morning of the murder, Tandy was gone; he never returned to her apartment, but days later he called her and told her he had "killed somebody." Tr. Vol. 3 at 121. This evidence shows that the CSLI mapping merely provided supplemental support for an already cohesive narrative, and the dissent's view of its centrality is inconsistent with the record in its entirety. Thus, our "confidence in the outcome of the proceeding below" is not undermined by the probable impact of the CSLI testimony. *Hayko*, 211 N.E.3d at 492.

## 2. Autopsy Photograph

[37] Tandy further argues that the trial court abused its discretion by admitting into evidence a "grotesque autopsy photograph depicting" Wallace's "head with the scalp peeled back to display [his] brain." Appellant's Br. at 23; *see also* Ex. Vol. 10 at 12.

[38] Our Supreme Court has said that relevant evidence, including a photograph which arouses the passions of jurors, "may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice." *Corbett v. State*, 764 N.E.2d 622, 627 (Ind. 2002) (quoting *Swingley v. State*, 739 N.E.2d 132, 133 (Ind. 2000)); *see also Halliburton v. State*, 1 N.E.3d 670, 676 (Ind. 2013); Ind. Evidence Rule 403. Moreover, "[e]ven gory and revolting photographs may be admissible as long as they are relevant to some material issue *or* show scenes that a witness could describe orally." *Halliburton*, 1 N.E.3d at 676 (quoting *Amburgey v. State*, 696 N.E.2d 44, 45 (Ind. 1998)) (emphasis in original).

[39] However, autopsy photographs "often present a unique problem because the pathologist has manipulated the corpse in some way during the autopsy." *Corbett*, 764 N.E.2d at 627. As such, "[a]utopsy photographs are generally inadmissible if they show the body in an altered condition." *Id.* This general rule applies to lessen the danger that the jury "may impute to the accused the handiwork of the pathologist and thereby render the defendant responsible . . . for the cuts, incisions, and indignity of an autopsy." *Custis v. State*, 793 N.E.2d

1220, 1225 (Ind. Ct. App. 2003), *trans. denied*. Nevertheless, "where some alteration of the body [was] necessary to demonstrate the testimony being given[,]" these photographs can be admitted. *Stewart v. State*, 945 N.E.2d 1277, 1289 (Ind. Ct. App. 2011), *trans. denied*.

[40] Tandy cites two cases in support of his argument that the autopsy photograph admitted at his trial was "just the type of photograph[]" that has been "condemned by our Supreme Court[.]" Appellant's Br. at 23. First, in *Swingley v. State*, the defendant challenged his murder conviction by arguing three autopsy photographs were erroneously admitted at trial. 739 N.E.2d 132, 133 (Ind. 2000). The victim had bled to death from a cut in the neck, and two of the photographs depicted the gaping neck wound. *Id.* at 134. Although it was unclear whether the body was altered in the photographs, the Supreme Court determined that the photos were "necessary to show the extent of the wound and the cause of death[,]" and their probative value outweighed their prejudicial effect. *Id.* The third photo, however, depicted the victim's larynx removed from his body and was unnecessary and erroneously admitted. *Id.* Despite this, because there was an abundance of other evidence against the defendant, the error was found to be harmless. *Id.*

[41] Second, in *Turben v. State*, the defendant was convicted of murdering his wife. 726 N.E.2d 1245, 1246 (Ind. 2000). He appealed his conviction on the basis that the trial court erred in admitting a gruesome autopsy photograph. *Id.* The photograph "showed gloved hands manipulating a bloody mass with a probe. The mass purportedly represented the victim's head with the skin and bones cut

open and peeled back to expose the interior of the victim's neck." *Id.* at 1247.
On transfer, the Supreme Court found that even if it assumed the photograph
was marginally relevant to the pathologist's testimony, the depiction of "a
bloody mass that barely resemble[d] a human form" did not "further
enlighten[]" the jury regarding the cause of death and "the photograph's
prejudicial impact outweighed its probative value." *Id.* But as in *Swingley*, the
Court deemed the error harmless. *Id.* at 1248.

[42] Tandy acknowledges that the State admitted State's Exhibit 267 to show the
trajectory of the gunshots but argues that a less inflammatory autopsy photo,
State's Exhibit 266, served that purpose. While the State agrees the photograph
at issue is "graphic" and showed Wallace's head in a manipulated state, it
contends the photo was admissible because it was relevant to the forensic
pathologist's testimony and its probative value outweighed its prejudicial effect.
Appellee's Br. at 26. It also argues there was "no danger" the jury would
impute Dr. Jacobi's manipulation of the body to Tandy because the doctor's
testimony "made it clear that he was the one who altered Wallace's body
during the autopsy by removing Wallace's skull cap[.]" *Id.* at 27.

[43] At trial, Dr. Jacobi identified himself as the forensic pathologist who performed
Wallace's autopsy to determine his cause of death. He then referred to several
autopsy photographs when discussing Wallace's injuries. When testifying
about the significance of State's Exhibit 267, the doctor mitigated potential
confusion and prejudice by explaining that he had pulled down Wallace's scalp
and that the purpose of this manipulation was to track the trajectory of the

bullets through his skull. *See* Tr. Vol. 4 at 159. Similar facts occurred in *Fentress v. State*, where the Court reasoned "[t]he potential for confusion [was] minimal" regarding two photographs depicting the victim's hair pulled back to show her shattered skull because the pathologist explained what he had done and the necessity of doing so to demonstrate the victim's wounds. 702 N.E.2d 721, 722 (Ind. 1998).

[44] Moreover, the autopsy photograph was necessary to illustrate Dr. Jacobi's testimony because the doctor's use of a probe in the photograph, which could only be accomplished by exposing Wallace's damaged skull, confirmed the trajectory of the bullets. Bullet trajectory was important because the State's theory of the case was that Tandy shot Wallace from close range in the passenger seat.[9] To that end, Dr. Jacobi testified that the nature of Wallace's wounds—six gunshots to the right side of his head from at least a foot away— "would fit" or "be a scenario" consistent with the State's theory that Tandy shot Wallace from the passenger's seat. Tr. Vol. 4 at 168. State's Exhibit 266, which depicted the entry wounds through Wallace's skin, did not serve that same purpose.

[45] The dissent characterizes State's Exhibit 267 as unnecessary and would find that any probative value the photograph had was substantially outweighed by

---

[9] The State also states that "Dr. Jacobi explained that this photograph was the only one that depicted all six gunshot wounds Wallace sustained." Appellee's Br. at 27. However, the record shows this statement is inaccurate; Dr. Jacobi had been referring to State's Exhibit 268 when he noted all six gunshots were visible. *See* Tr. Vol. 4 at 159-60; *see also* Ex. Vol. 10 at 13.

the risk of unfair prejudice it wrought due to its graphic depiction. While we acknowledge the photograph carried some risk of prejudice, the dissent's position intrudes upon the deference due to trial courts in the admission of evidence and the State's prerogative to prove its case. *See Butler v. State*, 647 N.E.2d 631, 634 (Ind. 1995) ("In a homicide case, the identity of the alleged victim and the assailant, the injury to the alleged victim and its source, the death of the alleged victim and its cause, and the physical surroundings in which the injury and death occurred, would all be facts of consequence in the determination of guilt of the accused."). Indeed, our Supreme Court has sanctioned the admission of similar autopsy photographs when they serve a demonstrative function tied to the pathologist's testimony. *See Halliburton,* 1 N.E.3d at 676-78 (finding the trial court did not abuse its discretion in admitting three "autopsy photographs showing the victim's neck and the skin pulled away from the victim's skull" because those photographs illuminated the wounds that contributed to the victim's death).

[46] Here, the record squarely aligns with that precedent and does not support appellate invalidation of the trial court's determinations regarding the necessity, probative value, and prejudicial effect of the photograph. Accordingly, we cannot say the court abused its discretion in admitting State's Exhibit 267.

## 3. Prosecutorial Misconduct

[47] Finally, Tandy argues that the trial court erred in denying his motion for relief from judgment based on prosecutorial misconduct. Specifically, he claims the deputy prosecutor committed a "blatant act of prosecutorial misconduct" by

telling Wallace's roommate, Martin, that the defense considered him a suspect in the murder, which "prevented [d]efense [c]ounsel [from] being able to meaningfully talk with Martin prior to trial." Appellant's Br. at 25. He contends this conduct deprived him of due process and his Sixth Amendment right to confront the witnesses against him.

## A. Waiver

[48] The State raises two preliminary arguments we must address to determine the appropriate standard of review: (1) Tandy did not properly preserve this claim for appellate review; and (2) even if his post-conviction, pre-sentence motion could have preserved the claim, a Trial Rule 60(B) motion was not the proper procedural vehicle by which to do so.

[49] When a prosecutorial misconduct claim was "*properly raised in the trial court*, we determine '(1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise.'" *Konkle v. State*, 253 N.E.3d 1068, 1077 (Ind. 2025) (quoting *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014), *reh'g denied*) (emphasis added). At a basic level, to properly preserve a claim of prosecutorial misconduct for appellate review, the defendant must "timely object[] to alleged misconduct by the prosecutor[.]" *Konkle*, 253 N.E.3d at 1082. An unpreserved claim of prosecutorial misconduct alters the standard under which we review the claim. *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006). When a defendant appeals a claim of prosecutorial misconduct not timely brought before the trial court, he "must

establish not only the grounds for the misconduct but also the additional grounds for fundamental error." *Id.* Prosecutorial misconduct constitutes fundamental error if it "made a fair trial impossible or [was] a clearly blatant violation of basic and elementary principles of due process that present[ed] an undeniable and substantial potential for harm." *Ferree v. State*, 124 N.E.3d 109, 114 (Ind. Ct. App. 2019), *trans. denied*.

[50] Here, the record supports the reasonable inference that Tandy's attorney was aware of the deputy prosecutor's alleged misconduct before trial yet did not raise the issue by objection or motion before or during trial. At the combined sentencing and motion for relief from judgment hearing, the following exchange occurred between defense counsel and Martin:

> Q: . . . Now I'd contacted you to talk about this case prior to the jury trial that was conducted in this matter, right?
>
> A: Yes.
>
> Q: And when we first spoke you were reluctant to speak with me, is that correct?
>
> A: That's correct.
>
> Q: You told me that?
>
> A: Yes.
>
> Q: Why was that?
>
> A: Um, I got a phone call that same day from someone from the prosecutor's office. I don't know who exactly. Saying that someone may contact me and may call me like I'm a suspect.

Tr. Vol. 5 at 166-67.

[51]     Because his attorney knew of the alleged misconduct before trial and did not raise the issue until after trial, Tandy waived the issue for review. *See Konkle*, 253 N.E.3d at 1081 (stating counsel cannot be aware of misconduct, proceed through trial without seeking relief, and then use the misconduct to set aside an unfavorable verdict).

[52]     Tandy's use of a Trial Rule 60(B) motion to bring this claim was also improper.

> Generally, our Trial Rules govern procedure and practice in civil cases only. We established the special procedures set out in the Indiana Post-Conviction Rules to facilitate review of criminal convictions and sentences. Criminal defendants may not circumvent these procedures by seeking remedies under the civil law. As our Post-Conviction Rule 1 says: "Except as otherwise provided by this rule, it comprehends and takes the place of all other common law, statutory, or other remedies heretofore available for challenging the validity of the conviction or sentence and it shall be used exclusively in place of them."

*Van Meter v. State*, 650 N.E.2d 1138, 1138 (Ind. 1995), *reh'g denied* (internal citations omitted). Moreover, Tandy filed his motion before he was sentenced, and Trial Rule 60(B) motions succeed the entry of final judgment. *See Terrell v. State*, 390 N.E.2d 208, 209 (Ind. Ct. App. 1979) (noting "sentencing is final judgment" in criminal proceedings).

Thus, by either metric the State raises, Tandy waived his prosecutorial misconduct claim. And because he did not raise the issue of fundamental error, he waived any such claim as well. *Curtis*, 948 N.E.2d at 1148.

## B. Misconduct

Waiver notwithstanding, Tandy argues that the deputy prosecutor engaged in misconduct by witness tampering. He points to our case law and Rule of Professional Conduct 3.4(a) in support of his position. *See Craft v. State*, 187 N.E.3d 340, 347 (Ind. Ct. App. 2022) ("Misconduct is measured by case law and the Rules of Professional Conduct."), *trans. denied*. Rule 3.4(a) provides, in relevant part, that an attorney shall not "unlawfully obstruct another party's access to evidence[.]" Along these lines, "[a] prosecutor may not prevent nor discourage a defense witness from testifying[,]" nor may he threaten a witness with criminal charges if he does testify. *Dorelle-Moore v. State*, 968 N.E.2d 287, 291 (Ind. Ct. App. 2012) (quoting *Diggs v. State*, 531 N.E.2d 461, 464 (Ind. 1988), *cert. denied*). Although "[d]efense witnesses must be free to testify without fear of governmental retaliation[,]" a defendant's right to present witnesses "is tempered by the witness's Fifth Amendment privilege not to provide incriminating testimony." *United States v. Johnson*, 437 F.3d 665, 677 (7th Cir. 2006), *cert. denied*. It follows that "[a] prosecutor may therefore caution a defense witness about the risks of testifying" so long as the substance of his communication does not reflect an attempt to coerce the witness into silence. *Id.*

[55] Tandy views the deputy prosecutor's comment to Martin "that he was the defense's suspect" as an attempt "to discourage Martin from talking with the [d]efense." Appellant's Br. at 27. However, the State proffers that the deputy prosecutor "did not threaten or otherwise discourage Martin from testifying in any way." Appellee's Br. at 32. The State compares the deputy prosecutor's actions to the circumstances in *Murray v. State*, 442 N.E.2d 1012 (Ind. 1982).

[56] In *Murray*, during the deposition of a potential witness in a murder case, the witness repeatedly asked whether he would face charges and if he needed a lawyer. *Id.* at 1018. During a recess in the deposition, the deputy prosecutor "advised the witness that the defense strategy would include implicating the witness." *Id.* Following the recess, the witness refused to answer questions. *Id.* at 1018-19. On appeal from his murder conviction, Murray argued that the deputy prosecutor "had tampered with the witness by trying to influence his testimony." *Id.* at 1019. Our Supreme Court found that "[i]t certainly d[id] not appear that it was improper for [the deputy prosecutor] to advise the witness . . . that there was an intent to pin th[e] crime on him and he ought to be aware of it in testifying." *Id.* The Court further found that Murray was not placed in grave peril because he was not prevented from having the witness testify at trial and the conduct occurred outside the presence of the jury and could not have influenced its verdict. *Id.*

[57] Here, similar to *Murray*, the deputy prosecutor did not commit misconduct by contacting Martin after he failed to show up for a deposition and "cautioning [him] about the defense's theory of the case[,]" which "he ought to be aware of

[] in testifying." Appellee's Br. at 33; *Murray*, 442 N.E.2d at 1019. Without more, we cannot infer that this comment was intended to discourage Martin from testifying.

## C. Grave Peril

[58] In any event, the deputy prosecutor's comment did not place Tandy in grave peril. "The gravity of peril is measured by *the probable persuasive effect* of the misconduct *on the jury's decision* rather than the degree of impropriety of the conduct." *Konkle*, 253 N.E.3d at 1077 (quoting *Ryan*, 9 N.E.3d at 667) (emphasis in original). Martin spoke to defense counsel before trial, he did not refuse to testify, and he was subpoenaed by the defense and appeared at trial, but the defense did not call him. *See* Tr. Vol. 5 at 168-69. Most importantly, none of the disputed conduct occurred in front of the jury, so it is unclear how the comment could have influenced the jury's decision in any respect. In fact, at the joint sentencing and motion for relief from judgment hearing, Tandy's attorney harped on the alleged inappropriateness of the comment but made no attempt to explain how it could have impacted the jury's decision. *See id.* at 177-80. We conclude that the deputy prosecutor's comment neither amounted to misconduct nor placed Tandy in grave peril, and thus, the trial court did not err in denying Tandy's motion for relief from judgment.

## Conclusion

[59] For the foregoing reasons, we affirm Tandy's convictions.

[60] Affirmed.

Scheele, J., concurs.
Tavitas, J., dissents with separate opinion.

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Fishers, Indiana


ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General
Indianapolis, Indiana

Rebekah D. Bennett
Courtney Staton
Deputy Attorneys General
Indianapolis, Indiana

Gabriela Alvarez
Certified Legal Intern
Indianapolis, Indiana

**Tavitas, Judge, dissenting.**

I respectfully dissent. The trial court committed reversible error by admitting Detective Richardson's testimony based on the Trax software and a gruesome autopsy photograph that served no purpose other than to inflame the jury against Tandy. Because these errors were not harmless in this circumstantial case, I would reverse Tandy's convictions and remand for a new trial.[10]

## I. Detective Richardson's testimony based on the Trax software was improperly admitted.

### A. Tandy did not waive his claim of evidentiary error.

I first disagree with the majority's conclusion that Tandy waived his Evidence Rule 702(b) claim by failing to object to Detective Richardson's testimony on the same grounds he now argues on appeal. Tandy explicitly raised reliability concerns with the Trax software used by Detective Richardson to calculate the location of the cell phones. During preliminary questioning, Tandy asked Detective Richardson about a Colorado case finding Trax unreliable, Tr. Vol. V p. 13, elicited testimony that Detective Richardson was familiar with criticisms of the Trax software, and established that the "pie wedges" depicted in the presentation did not represent definitive boundaries. When the State moved to

---

[10] Because these errors require reversal, I express no opinion regarding Tandy's argument regarding prosecutorial misconduct.

admit the PowerPoint presentation as an exhibit, defense counsel objected "on the basis of the unreliability of the science." *Id*. at 17.

[63] Detective Richardson's subsequent testimony was based on the Trax software. He did not independently calculate cell phone locations; instead, he relied on Trax's automated processing of cell tower data. He then "manually mapped several of the results to check their accuracy." *Id.* at 45. When Tandy objected to the reliability of the software that formed the foundation of Detective Richardson's testimony, he necessarily objected to the detective's testimony based on this software.

## B. The State failed to meet its burden under Evidence Rule 702(b).

[64] Addressing the merits of the admissibility of Detective Richardson's testimony and the software upon which it was based, I note that the State presented no evidence that the Trax software rests on reliable scientific principles. Indiana Evidence Rule 702(b) requires that "[e]xpert scientific testimony" be "admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles." Our Supreme Court in *Kubsch v. State*, 784 N.E.2d 905, 921 (Ind. 2003), endorsed the *Daubert*[11] factors as guideposts for assessing the reliability of expert testimony. These factors are: (1) whether the theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate;

---

[11] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

and (4) general acceptance within the relevant field. *Id.* The record here is devoid of evidence on any of these factors. The State offered no testimony about testing, peer review, error rates, or general acceptance, and the trial court made no preliminary assessment of reliability. The admission of Detective Richardson's testimony based on the Trax software was, thus, improper under Evidence Rule 702(b).

## C. Detective Richardson was not a skilled witness.

The majority also concludes that Detective Richardson was a "skilled witness" rather than an expert witness, relying on *McCowan v. State*, 10 N.E.3d 522 (Ind. Ct. App. 2014), *trans. granted, summarily aff'd in relevant part*, 27 N.E.3d 760, 768 (Ind. 2015). I find *McCowan* distinguishable. There, the detective used software to plot latitude and longitude coordinates provided by Verizon, then explained general cell phone network principles to help the jury understand Verizon's records. The *McCowan* court held that this was skilled witness testimony because the detective "did not perform any calculations or analysis" and merely provided "contextual testimony." *Id.* at 532-33.

Here, Detective Richardson used proprietary Trax software that performs complex algorithmic analyses to generate location estimates from cell tower data—not simple coordinate plotting. The software makes assumptions about cell phone behavior (such as that phones always connect to the nearest tower), applies unpublished methodologies, and produces visual representations that suggest precision that does not exist. Instead of the mere plotting that occurred

in *McCowan,* Detective Richardson relied on a black-box analytical tool that generates conclusions.[12]

[67] Furthermore, even the testimony of a skilled witness must be "rationally based [on] the witness's perception." Ind. Evidence Rule 701(a). Detective Richardson's testimony was not based on his own perceptions, but on Trax's automated output. When a witness testifies based on a software-generated analysis rather than personal observation or experience, the reliability of that software becomes central to admissibility, which is what is addressed by Rule 702(b).

[68] Lastly, the distinction between "accuracy" and "reliability" that was made in *McCowan* is inapplicable here. The *McCowan* Court wrote that challenges to "the accuracy of the particular results" differ from challenges to scientific reliability. *Id*. at 533. But during preliminary questioning, defense counsel elicited testimony about fundamental problems that have been identified with the Trax software: (1) Trax uses what has been called "a profoundly flawed practice" with "no basis in the science of R[adio] F[requency] engineering, or any engineering practices, even in the crudest approximations"[13]; (2) the

---

[12] The majority claims that the cellular service providers, not Trax, provided the data used by Detective Richardson. But, to me, the question is not who initially collected the raw data from the cell towers; the issue is what the software did with that data. The Trax software made assumptions about cell phone behavior and transformed the data into geographic coordinates and "pie wedges" that suggest precise boundaries. This process is what is subject to Rule 702(b)'s reliability requirements.

[13] Vladan M. Jovanovic & Brian T. Cummings, *Analysis of Mobile Phone Geolocation Methods Used in US Courts*, 10 INST. ELEC. & ELECS. ENG'RS ACCESS 28037, 28051 (2022).

software's creator inflated his credentials by claiming to be an engineer when he held only an associate's degree; (3) the software has been subject to no peer review or testing, and no error rate data exists;[14] (4) critics have stated that the methods used by Trax "cannot reliably place a suspect near a crime scene."[15] These are problems of scientific reliability, not mere disputes about accuracy in a particular case.

[69] I recognize that, in *United States v. Reynolds*, 86 F.4th 332, 347 (6th Cir. 2023), the Sixth Circuit upheld the admission of Trax evidence. The Court's holding was based on "the specific record created in this case"—a record that included extensive foundational testimony about Trax's methodology, testing, and reliability. *Id*. at 347-48. But the State presented no such foundational evidence here. *Reynolds* does not hold that Trax is presumptively reliable; it holds that a court may find reliability if the proponent lays an adequate foundation.

## II. The admission of State's Exhibit 267 was improper.

[70] I also disagree with the majority regarding the admission of State's Exhibit 267. This exhibit consists of an autopsy photograph of Wallace's scalp peeled down over his face to expose his skull. This is precisely the type of autopsy

---

[14] *See Order Granting Motion to Exclude Historical Cell Site Location Information Based on Trax Software*, *People v. Jones*, No. 2022CR196 (Larimer Cnty. Dist. Ct., Sept. 20, 2022).

[15] *Id.* (citing Michael Cherry, *et al.*, Cell Tower Junk Science, 95 JUDICATURE 151, 152 (2012).

photograph that our Supreme Court has held inadmissible under similar circumstances.

## A. State's Exhibit 267 shows the body in an altered condition.

"Autopsy photographs are generally inadmissible if they show the body in an altered condition." *Corbett v. State*, 764 N.E.2d 622, 627 (Ind. 2002). This rule exists because "the jury may impute to the accused the handiwork of the pathologist and thereby render the defendant responsible. . . for the cuts, incisions, and indignity of an autopsy." *Custis v. State*, 793 N.E.2d 1220, 1225 (Ind. Ct. App. 2003). State's Exhibit 267 shows Wallace's body in an altered state. The photograph depicts Dr. Jacobi's hands manipulating Wallace's head, with the scalp pulled completely down over the face, with the skull cap having been removed and then put back in place, and a wooden probe inserted through a bullet hole. As defense counsel noted at trial, this image is "not the function of the way he was killed but a function of the autopsy . . . ." Tr. Vol. IV p. 138.

## B. The admission of the photograph was unnecessary.

The majority accepts the State's argument that State's Exhibit 267 was necessary to show the bullet's trajectory and the full extent of Wallace's injuries. I recognize that Dr. Jacobi testified that one gunshot wound was "hidden from the previous picture by the hairline" and that Exhibit 267 showed "the trajectory or the path" using a wooden probe. Tr. Vol. IV p. 159. Yet even accepting that State's Exhibit 267 had some additional probative value

beyond what the other autopsy photographs provided, that probative value was minimal and was substantially outweighed by the danger of unfair prejudice.

[73]     State's Exhibit 266 depicts the entry wounds in Wallace's scalp without the autopsy manipulation. Dr. Jacobi testified extensively about the trajectory of the bullets and how the pattern of six gunshot wounds to the right side of Wallace's head "would fit" the State's theory that Tandy shot Wallace from the passenger seat. Tr. Vol. IV p. 168. The trajectory could be, and was, explained through testimony. Although State's Exhibit 267 may have shown one additional wound location and included a demonstrative probe, this marginal additional information came at a high cost in terms of inflammatory impact.

[74]     I cannot easily distinguish *Turben v. State*, 726 N.E.2d 1245 (Ind. 2000), and *Swingley v. State*, 739 N.E.2d 132 (Ind. 2000). In *Turben*, the State admitted into evidence a photograph showing "gloved hands manipulating a bloody mass with a probe" where "the mass purportedly represented the victim's head with the skin and bones cut open and peeled back to expose the interior of the victim's neck." 726 N.E.2d at 1247. Our Supreme Court held that, even if this photograph was marginally relevant, it created unfair prejudice because it depicted "a bloody mass that barely resemble[d] a human form" and did not "further enlighten[]" the jury about the cause of death. *Id.* The same is true for State's Exhibit 267; it shows gloved hands, a wooden probe, and depicts Wallace's scalp pulled down over his face. The image is shocking not because of what the perpetrator did, but because of what the pathologist did during the autopsy.

[75] Similarly, in *Swingley*, our Supreme Court held that a photograph of a removed larynx was erroneously admitted because other photographs showed the neck wound, rendering the autopsy photograph unnecessary. 739 N.E.2d at 134. Here, while State's Exhibit 267 showed one additional wound and demonstrated trajectory with a probe, State's Exhibit 266 showed the critical entry wounds, and Dr. Jacobi's testimony adequately explained the trajectory. The probative value of State's Exhibit 267 was minimal.

[76] In *Fentress v. State*, 702 N.E.2d 721 (Ind. 1998), the Court found photographs depicting the victim's skull with hair and skin pulled away to be admissible because the pathologist explained what he had done and that the alteration was necessary to determine the extent of the damage to the victim's skull. Again, I acknowledge that Dr. Jacobi explained his manipulation of Wallace's body. But *Fentress* is distinguishable because, in that case, the damage to the skull was only visible if the skin was pulled back, and the damage to the skull was probative to "show the force of the blow which in turn bore on the intent to kill . . . ." *Id*. at 722.

[77] Here, however, Tandy did not dispute that Wallace died from multiple gunshot wounds, nor did he dispute the trajectory or the general location of the entry wounds. The State's theory that Tandy shot Wallace from the passenger seat could be adequately explained through State's Exhibit 266 and Dr. Jacobi's testimony, even if State's Exhibit 267 provided some marginal additional demonstration. Thus, the question is not whether Dr. Jacobi explained the

photograph, but whether the photograph's minimal probative value justified its inflammatory nature.[16]

[78] Even if State's Exhibit 267 had some probative value beyond State's Exhibit 266, that value was "substantially outweighed by the danger of unfair prejudice." Ind. Evidence Rule 403. The danger here is not simply that the photograph was gory. A reasonable juror viewing State's Exhibit 267 would see a person's face peeled away, skull cut and exposed, and head probed with a wooden stick. The natural human emotional reaction to such imagery is revulsion. Even with Dr. Jacobi's explanation, there is a danger that the jury's passions against the perpetrator would be inflamed. This risk is especially problematic in a case that relied on circumstantial evidence like this one. The unnecessarily inflammatory autopsy photograph risked tipping the scales toward conviction by inflaming the jury's passions.

## III. These errors are not harmless.

## A. The error in the admission of the Trax-based testimony was not harmless.

[79] I also disagree with the majority's conclusion that the admission of Detective Richardson's testimony based on the Trax software was harmless. As explained in *Hayko v. State*, 211 N.E.3d 483, 492 (Ind. 2023), we must assess

---

[16] Moreover, as the majority notes, the State incorrectly claimed this photograph was the only one depicting all six gunshot wounds, when it was actually State's Exhibit 268 in fact showed all six wounds. This further demonstrates the minimal additional probative value of State's Exhibit 267.

"the likely impact of the improperly admitted . . . evidence on a reasonable, average jury in light of all the evidence in the case," not merely whether sufficient independent evidence exists. Indeed, Appellate Rule 66(A) provides that "[n]o error or defect in any ruling or order or in anything done or omitted by the trial court . . . is ground for granting relief or reversal on appeal where its probable impact, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties." App. R. 66(A); *see also Harris v. State*, 259 N.E.3d 299, 305 (Ind. 2025) (citing Appellate Rule 66(A) and noting that the probable impact of a trial court's deprivation of a substantial right "will vary from case to case.").

[80] Here, the State's case was circumstantial, and the CSLI evidence was a key component of the State's theory of the case. The State's theory required proof that Tandy and Wallace met in Jeffersonville around the time of the murder. The CSLI evidence, which was displayed in colorful PowerPoint slides with graphics suggesting scientific precision, provided critical corroboration of the State's timeline. Although the doorbell camera captured a car resembling Wallace's Impala driving toward Love's apartment at 2:33 a.m., and text messages showed the two men were planning to meet, the CSLI evidence purported to place both phones in the same geographic area during the critical time window when Wallace was killed.

[81] Moreover, the State's remaining evidence had significant weaknesses. The DNA and fingerprints in the car only show that Tandy had been in Wallace's car at some point, which is not surprising given their admitted friendship and

drug transactions. This does not prove that he was in the car at the time Wallace was killed. Love did testify that Tandy told her he "killed somebody," Tr. Vol. III p. 121, but she had changed details of her account.[17] The text messages show that Tandy and Wallace had a disagreement but do not directly implicate Tandy in the murder. The State's case depended heavily on circumstantial evidence. The CSLI evidence, which was presented with an aura of scientific authority through the colorful charts and precise-looking "pie wedges," was a key piece of evidence in the State's case. Under these circumstances, I cannot say that the improperly admitted CSLI evidence did not contribute to the jury's verdict.

### B. The admission of State's Exhibit 267 was not harmless when combined with Detective Richardson's testimony.

[82]  Even if the admission of State's Exhibit 267 was, by itself, harmless, the combined effect of the admission of that photograph and the admission of Detective Richardson's testimony undermined the fairness of Tandy's trial. As noted above, the CSLI evidence gave the State's circumstantial case the appearance of scientific legitimacy that it did not deserve, and the autopsy photograph risked inflaming the jury's passions against Tandy.

[83]  Our Supreme Court has held that the combined effect of trial errors can amount to a violation due process under the federal and Indiana constitutions such that

---

[17] Initially, Love claimed that she was in a noisy bar when Tandy called her. She later stated that she was at home in bed asleep when he called.

reversal is warranted "even if each [error] might be deemed harmless in isolation." *Inman v. State*, 4 N.E.3d 190, 203 (Ind. 2014). Here, the admission of Detective Richardson's testimony was, in itself, not harmless; consequently, the combined effect of these two evidentiary errors was not harmless. Thus, I cannot say that the inadmissible evidence did not impact the jury's verdict. *See Hayko*, 211 N.E.3d at 492.

[84] I pause to note that repeatedly finding errors to be harmless risks eroding the due process right to a fair trial found in both the federal and Indiana constitutions. Although we cannot expect a trial court to conduct a "perfect" trial, the guarantees enshrined in our constitutions must be upheld. I also believe that the more serious the penalty—such as in a murder case like this— the more critical these constitutional safeguards become. I would, accordingly, reverse Tandy's convictions and remand for a new trial.